## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

BENNY ROBINSON,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

_____/

CASE NO. 2:15-cv-11377

DISTRICT JUDGE STEPHEN J. MURPHY, III
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGEMENT
(Docs. 13, 16)

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. 13) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**.

## II.      REPORT

### A.      Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability, Disability Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Transcript, Doc. 11, at 15.) The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 16.)

Plaintiff Benny Robinson was 52 years old at the most recent administrative hearing. (Tr. 34.) On May 31, 2012, Plaintiff filed the present claims for DIB and SSI, alleging that he became unable to work on January 1, 2010. (Tr. 122, 131.) Plaintiff's past work included work as a HILO driver for 6 years, a maintenance person for 2 years, and a press operator for 2 years. (Tr. at 158.)

The Commissioner considered affective disorders and sprains and strains of all types and denied Plaintiff's claims at the initial administrative stage. (Tr. 82, 83.) On September 11, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Janet Alaga-Gadigian, who considered the application for benefits *de novo*. (Tr. 29-63.) In her decision, issued on October 4, 2013, the ALJ found that Plaintiff was not disabled. (Tr. 25.) Plaintiff requested a review of this decision on December 7, 2013. (Tr. 7-11.)

The ALJ's decision became the Commissioner's final decision on February 14, 2015, when the Appeals council denied Plaintiff's request for review. (Tr. 1-6.); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004). On April 15. 2015, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl's Compl., Doc. 1.)

## B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D.    ALJ Findings**

Following the five step analysis, the ALJ found Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff met the insured status requirements through December 31, 2012, and had not engaged in substantial gainful activity since January 1, 2010, the alleged onset date. (Tr. 17.) At Step Two, the ALJ found Plaintiff had the following severe impairments: "chronic joint pain, major depressive disorder, personality disorder, schizoaffective disorder, and substance abuse disorder." (Tr. 18.) At Step Three, the ALJ found that Plaintiff's combination of impairments met Listing 12.04 and 12.09 in the regulations. (Tr. 18-19.) The ALJ then found that if Plaintiff stopped the substance use, the remaining limitations would cause more than a minimal impact on the Plaintiff's abilities to perform basic work activities; therefore, Plaintiff would continue to have a severe impairment or combination of impairments. (Tr. 19.) The ALJ also found that if Plaintiff stopped the substance use, he would not have an impairment or combination of impairments that meets or medically equals any of the Listings in the regulations. (Tr. 19-20.) The ALJ then found that if Plaintiff stopped the substance use, he would have the residual functional capacity ("RFC") to perform a limited range of medium work, (Tr. 20-24,) but would not have the ability to perform any past relevant work. (Tr. 23-24.) The ALJ found at Step Five, that if Plaintiff stopped the substance use, a significant number of jobs existed which Plaintiff could perform despite his limitations. (Tr. at 24.) The ALJ also found that Plaintiff was 48 and therefore a younger individual (age 18-49) on the alleged onset date. (*Id.*) Finally, the ALJ concluded that substance use disorder is a contributing factor material to the determination of disability because Plaintiff would not be

5

disabled if he stopped substance use. Because the ALJ found substance use is a contributing factor material to the determination of disability, the ALJ determined that Plaintiff is not disabled under the Act. (Tr. 25.)

###    E.    Administrative Record

####       1.    *Medical Records*

Plaintiff underwent a Psychiatric Evaluation and Mental Status Examination on June 19, 2012 with Someswara Navuluri, M.D.. (Tr. 204-05.) Dr. Navuluri stated that Plaintiff "thinks he was discriminated [against for] being a black [person]." (Tr. 204.) Dr. Navuluri found Plaintiff to be "very manipulative and superficial" and noted that he "doesn't want to answer my questions. Patient is going back to his thinking that people discriminate [against] him." (*Id*.) Dr. Navuluri noted that Plaintiff "doesn't want to talk about his drug abuse" and despite having been in "rehab program 3 or 4 times" was "still using drugs." (*Id*.) It was also noted that Plaintiff had never seen a psychiatrist, he denied any suicidal thoughts or plans, and that he has "[n]o medical problems." (*Id*.) Dr. Navuluri found Plaintiff's speech to be "clear and coherent[,]" his "[t]hinking was clear and goal directed[,]" he was "[n]ot psychotic[,]" his "[a]ffect was shallow[,]" his  "[m]ood was labile[,]" he "was very needy, demanding and argumentative[,]" and "tried to minimize the drug addiction and also alcohol abuse." (Tr. 205.) Plaintiff "complains of insomnia" and "takes naps all through the day." (*Id*.) He was "alert, oriented in time, place and person" and his "memory was intact[,]" his "[i]nsight limited[,]" and his "[j]udgment was good." (*Id*.) Dr. Navuluri diagnosed depressive disorder, NOS, alcohol, cocaine, and marijuana abuse and dependence, and personality disorder, NOS. (*Id*.) Plaintiff was assessed a GAF score of 55 and the prognosis was guarded. (*Id*.)

6

Plaintiff also submitted reports from 1978 showing that he was a special education student with respect to reading. (Tr. 197-99.)

On August 28, 2012, Plaintiff underwent an examination, at the request of Disability Determination Services, with Cynthia Shelby-Lane, M.D.. (Tr. 206-13.) Dr. Shelby-Lane noted that Plaintiff lived in Mississippi until age 14, witnessed horrendous acts of discrimination and "thinks he is being discriminated against because he is black." (Tr. 206.) Plaintiff admitted "a history of using alcohol a pint a day and two beers a day[,]" that he "has done illegal things to maintain his drug and alcohol habit" and that he "has been using marijuana, cocaine and crack" and that he "last used crack cocaine seven days prior to this exam." (*Id.*) Plaintiff was in a motor vehicle accident in 1987 and reported "back, shoulder and neck pain" since that time. (*Id.*) All of the systems examined by Dr. Shelby-Lane were within normal limits; thus, Dr. Shelby-Lane concluded that Plaintiff has a "history of chronic joint pain" but that he "does not need further investigation for problems related to his bones and joints. There is no evidence of any neurological disorganization or joint instability at this time." (Tr. 207-08.)

In November 2012, Dr. Navuluri noted that Plaintiff was "actively using cocaine on a regular basis" and advised Plaintiff that "the use of illicit drugs only makes his uncontrolled HTN worse, coupled with his being asymptomatic[.]" (Tr. 215.) In January 2013, Dr. Navuluri noted that Plaintiff was "happy with the medications" and that his "[a]nxiety and depression are lifting." (Tr. 216.) Later in January 2013, Dr. Manuel Tancer noted that Plaintiff had complained that his other doctor did not listen, that Plaintiff "[p]erseverates about maltreatment by whites" and that Plaintiff reported he "hears voices calling his name and sees flashes of people[.]" (Tr. 218.) Nonetheless, Plaintiff was oriented times three and his

7

insight/judgment was fair. (*Id.*) In March 2013, Dr. Tancer found Plaintiff was "[m]ore depressed" and "[b]rought disability forms for me to complete/sign[,]" and that he "[c]ontinues to perseverate/ruminate about racism/discrimination." (Tr. 221.) In July 2013, Dr. Tancer noted that Plaintiff still using crack cocaine, and was "bullied/beaten as a child because of his skin color" and "[f]eels he has been mistreated his whole life." (Tr. 233.) Dr. Tancer consistently assessed a GAF score of 40-42. (Tr. 217-35.) Also in July 2013, Plaintiff presented to the emergency room reporting back pain and hypertension, he was released the same day. (Tr. 238-39.)

### 2.    *Function Reports*

In the third party function report completed by Plaintiff's niece, it was noted that Plaintiff can make his own meals for 45 minutes at a time, he mows the lawn and does laundry for one to two hours at a time, he walks, rides a bicycle, shops in stores, and is able to handle his own finances. (Tr. 164-66.) Plaintiff's own report indicated the same daily activities noting that he mows the lawn for 1½ hours and does laundry for one hour at a time. (Tr. 173.)

### 3.    *Hearing*

Plaintiff was represented by counsel at the administrative hearing. Plaintiff testified that he lives alone in an upper flat in the City of Detroit. (Tr. at 35-36.) When asked why he stopped working in 2007, Plaintiff responded, "Economy. Laid - - I got laid off." (Tr. at 40.) When asked, by his lawyer, what mental conditions Plaintiff suffers from, Plaintiff responded, "Paranoia. I just don't like being around white people. I think they're evil. And things that I went through all recurred back from when I was in [sic] a child in Mississippi and I feel like all them - - I can't look my boss in the eyes, I, you know, I - - I just do - - feel like I'm a slave to

8

them, you know? When they ask me to do something, I run - - I run to do it like I used to in Mississippi." (Tr. 41.) Plaintiff also indicated that he does "hear voices and I think about suicide all the time[.]" (*Id*.) Plaintiff also described feeling "less than a man[,]" and being "scared to go outside" and being sweaty and nervous because he doesn't like being around people. (Tr. 41-42.) Plaintiff also stated that he has trouble concentrating and cannot finish what he starts. (Tr. 42.) Plaintiff has testified to having pain in his back, knees, hands and wrists. (*Id*.) Plaintiff stated that he can stand or walk for 10 minutes, walk about one block and can bend a little but cannot squat. (Tr. 43, 46.) Plaintiff indicated that, on a typical day, he eats, watches television, looks out the window, paces, and lies down frequently, "[s]ometimes all day." (Tr. 43-44.) Plaintiff cooks things like pancakes, eggs, bacon, fried chicken and beans, or a sandwich; he does his own laundry in the basement of the house, and sometimes mows the lawn, which includes a vacant lot next door but it takes him two days. (Tr. 45-47.) Plaintiff was taking Vicodin and IBP Motrin 600s for pain at the time of the hearing. (Tr. 47.) Plaintiff does not socialize much because "[i]t makes me nervous" and "I don't like being around people." (*Id*.)

Plaintiff testified that crack cocaine, which he has used for 20 years, "helps me stop thinking about the past. . . . I don't think about prejudice and what happened to me in Mississippi for 14 years." (Tr. 48.) Plaintiff testified that he uses cocaine about once a week, but that he had not used cocaine for one month before the hearing. (*Id*.) Plaintiff indicated that "I'd be depressed before I used it and I'd get sometimes depressed after I used it." (*Id*.) When asked how he felt at the hearing, Plaintiff responded, "Depressed. I think about -- I think about -- I got to think about Trayvon Martin when he got killed. I think about all them kind of

things. I – I – I judge everything that comes on TV. I judge the crime that's being committed by white people and then crime committed by a black person and it's not treated the same. I see a difference." (Tr. 49.) When asked whether he could still function when high on cocaine, Plaintiff responded "[s]ometimes" but then stated that he really could not still function when high and that the cocaine "makes me not think about nobody." (*Id.*) Plaintiff uses alcohol "every now and then" and can still function when drinking "[n]inety percent of the time." (Tr. 50-51.) Plaintiff also uses marijuana "[e]very now and then." (Tr. 51.) When asked whether his mental health symptoms get worse when he uses crack cocaine, Plaintiff responded, "I mean I think of suicidal [sic] before I use and sometimes, like I told you, sometimes after I use. I know it takes away my pain, my mental thoughts of hurting myself." (Tr. 54.)

The Vocational Expert ("VE") testified that he would let the ALJ know if any of his testimony conflicted with the *Dictionary of Occupational Titles* ("DOT"). (Tr. 55.) The ALJ asked the VE the following hypothetical:

> Assuming a person of the same age, education, and work experience as the claimant who can perform work at all exertion levels, however, there should be no climbing of ladders, ropes, scaffolds; the person should avoid all exposure to hazardous machinery or unprotected heights; all work is limited to unskilled jobs as defined in the DOT with specific vocational preparation levels of 1 or 2 with simple, routine tasks; no production rate work; no interaction with the general public; no more than occasional interaction with coworkers and supervisors with no tandem tasks required.

(Tr.58.) The VE testified that such an individual could not perform Plaintiff's past work but could perform 20,000 jobs in the southeast area of Michigan with 35,000-40,000 jobs statewide doing janitorial work such as porters, laundry workers or kitchen helpers. (Tr.

58-59.) The ALJ next asked him to consider a hypothetical person with Plaintiff's background who

> is restricted to a range of medium work as defined by the regulations, however, there should be no foot control operation; no climbing of ladders, ropes, scaffolds; no more than occasional climbing of ramps and stairs; this person should avoid all exposure to hazardous machinery or all unprotected heights; the work is again limited to unskilled jobs as in the previous hypothetical; no production rate work; no interaction with the general public; no more than occasional interaction with coworkers and supervisors with no tandem tasks required.

(Tr. 59.) The VE responded that such an individual could not perform Plaintiff's past work but could perform the jobs the VE mentioned under the previous hypothetical, except the kitchen helper work would be precluded because of the proximity of coworkers. (Tr. 59-60.) The other janitorial jobs would be performed at night or away from others. (Tr. 60.) The number of available jobs would decrease by 4,000 in the local area and 7,500 in the State. (Tr. 60-61.)  The VE indicated that to perform these jobs, a person "should be able to walk, stand, bend, squat, lift, [and] carry." (Tr. 61.)

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the

Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §

404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be

13

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment." 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

14

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.   Analysis

Plaintiff argues that the ALJ's decision is not supported by substantial evidence at Steps Two, Three, Four or Five. (Doc. 13.) At Step Two, Plaintiff argues that the ALJ "rejects" that Plaintiff suffers from a learning disability based on the fact that Plaintiff is able to operate a

motor vehicle independently. (Doc. 13 at ID 288.) At Step Three, Plaintiff argues that the ALJ found Plaintiff met Listing 12.04 but then improperly found that his substance abuse is material and that if he stopped his substance use he would not meet the Listing. (Doc. 13 at ID 289-90.) Plaintiff argues that the medical records paint a different picture from the ALJ's conclusion. At Step Four, Plaintiff argues that the ALJ has "zero justification for her RFC" and that it ignores Plaintiff's "severe pain[.]" (Doc. 13 at ID 290.) At Step Five, Plaintiff argues that the ALJ cannot rely on the VE's testimony because the VE was asleep during the hearing. (Doc. 13 at ID 292-93.)

First, as to the ALJ's findings at Step Two, the ALJ did not find Plaintiff's learning disability to be severe based not only on the fact that he could operate a motor vehicle independently but also because he "worked for twenty-two years, which accounts for a high-school level of functioning" in addition to his activities of daily living. (Tr. at 18.) The only evidence Plaintiff submitted regarding his learning disability was a record from 1978 showing that he was a special education student with respect to reading. (Tr. 197-99.) Plaintiff focuses on the two times that PTSD is mentioned in the medical records. (Doc. 13 at ID 288; Tr. 208, 236.) However, this information is limited to statements that any PTSD is not related to military service but rather stems from the bullying and discrimination he suffered in Mississippi, before he was 13 years old, and before 1983. (Tr. 36.) After that time, Plaintiff was able to work three different jobs. (Tr. 36-40, 179.) Therefore, this evidence is insufficient to show an ongoing learning disability or PTSD that prevents Plaintiff from working. Thus, the ALJ committed no error at this Step.

As to Step Three, Plaintiff does not dispute the ALJ's finding that Plaintiff met Listing 12.04 but argues that the ALJ improperly found that he would not be disabled if he stopped the substance use. The regulations provide the proper procedure to determine if substance use is material to the determination of disability. 20 C.F.R. §§ 404.1535, 416.935. First, the ALJ must determine whether Plaintiff suffers from a disability from symptoms that include substance abuse. In making this determination, the ALJ considers the assumed effects of substance abuse disorders considering "strictly symptoms, not causes[.]" *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003). Next, the ALJ must determine whether the substance use is a contributing factor material to the determination of disability, i.e. whether the "limitations would remain when the effects of the substance use disorders are absent." *Id*.; 20 C.F.R. §§ 404.1535, 416.935. Plaintiff bears the burden of demonstrating that the substance abuse is not a contributing factor material to his disability. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122-25 (2nd Cir. 2012); *see also Zarlenga v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).[1]

Here, I suggest that the ALJ not only followed the proper sequence of evaluation but also that her findings are supported by substantial evidence. The ALJ considered all the functional areas and found that if Plaintiff stopped the substance use, he would have only mild limitations in activities of daily living, moderate limitations in social functioning, moderate limitation in concentration, persistence or pace, and no episodes of decompensation of

---

[1] The ALJ in the instant case properly followed this process and did not "put the cart before the horse" by finding substance abuse to be a contributing factor material to the determination of disability without first finding Plaintiff disabled, as many ALJs have done. *Williams v. Barnhart,* 338 F. Supp. 2d 849, 962-63 (M.D. Tenn. 2004).

17

extended duration. (Tr. 19-20.) There is simply no evidence to support a contrary finding. When asked whether he could still function when high on cocaine, Plaintiff responded "[s]ometimes" but then stated that he really could not still function when high and that the cocaine "makes me not think about nobody." (Tr. 49.) When sober and seen by his doctors, Plaintiff was oriented in all three spheres, alert, his thinking was clear, his judgment was good, and his memory was intact. (Tr. 205, 216, 218.) The ALJ properly relied on these findings in making her determination, and Plaintiff failed to present any evidence to meet his burden to show that substance abuse is not a contributing factor material to his disability. *Cage*, 692 F.3d at 122-25.

As to Step Four, I suggest the ALJ's RFC findings are supported by substantial evidence. The ALJ does a thorough review of the evidence of record. (Tr. 20-24.) Although Plaintiff argues that he could not perform medium work because it requires "constant" use of his bilateral hands and walking and lifting "most of the day" (Doc. 13 at 291), medium work actually requires standing or walking on and off for 6 hours in an 8-hour workday and use of the hands only as needed to perform the tasks. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). There is no evidence that Plaintiff could not perform the limited range of medium work suggested by the ALJ. The only evidence of any physical maladies is from Dr. Shelby-Lane who noted that Plaintiff reported "back, shoulder and neck pain" since his car accident in 1987 but who also found all of the systems examined were within normal limits. (Tr. at 205-06.) Accordingly, although Dr. Shelby-Lane concluded that Plaintiff has a "history of chronic joint pain" she also stated that he "does not need further investigation for problems related to his bones and joints. There is no evidence of any neurological disorganization or joint instability at

this time." (Tr. 207-08.) Thus, there is no evidence of any physical limitations. As to mental limitations, the ALJ's RFC limited work to unskilled work that did not have any production rate requirement. (Tr. 58.) Plaintiff did not supply any evidence supporting any further restrictions and thus, failed to meet his burden here as well. 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5; and *Pruitt v. Comm'r of Soc. Sec.*, No. 14-cv-11230, 2015 WL 5730023, at *7 (E.D. Mich. Aug. 24, 2015) ("[A] limitation of non-production-rate work is a common and adequate limitation for those persons who suffer from moderate difficulties in concentration, persistence, or pace. . . . Plaintiff does not explain what additional limitations the ALJ should have imposed.").

Finally, as to Step Five, Plaintiff suggests that the VE's testimony must be completely discounted because the VE fell asleep during the hearing. First, the VE was "nodding off" during the questions regarding Plaintiff's past work history, (Tr. 51-52,) and not when asked to consider the hypotheticals posed by the ALJ. In addition, the VE admitted to nodding off "slightly" because it was "very hot" in the hearing room, but also indicated that he did not even miss the testimony about the past work. (Tr. 52.) Plaintiff presents no factual or legal reason to undermine the VE's testimony regarding the availability of jobs that could be performed under the hypothetical scenarios posed by the ALJ.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Robinson's Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

19

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987.) Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

20

Date:  April 28, 2016              S/ PATRICIA T. MORRIS
                                   Patricia T. Morris
                                   United States Magistrate Judge


**<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: April 28, 2016              By s/Kristen Krawczyk
                                   Case Manager to Magistrate Judge Morris